# IN THE COURT OF APPEALS OF IOWA

No. 16-1571
Filed October 25, 2017

IN RE THE MARRIAGE OF JESSICA K ROGERS
AND JASON P. ROGERS

Upon the Petition of
**JESSICA K. ROGERS, n/k/a JESSICA K. AYERS,**
    Petitioner-Appellant/Cross-Appellee.

**And Concerning**
**JASON P. ROGERS,**
    Respondent-Appellee/Cross-Appellant.

_____

Appeal from the Iowa District Court for Scott County, Mark D. Cleve, Judge.

The wife appeals, and the husband cross-appeals, various economic provisions of the decree dissolving their marriage. **AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED.**

Alicia D. Gieck of H.J. Dane Law Office, Davenport, for appellant.

M. Leanne Tyler of Tyler & Associates, P.C., Bettendorf, for appellee.

Heard by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

Jessica Rogers (now known as Jessica Ayers) appeals from the decree dissolving her marriage to Jason Rogers. Jessica claims the district court should have included Jason's annual bonuses in his annual income for the purpose of calculating his child-support obligation. She also claims the award of spousal support was inequitable and asks us to award her $6500 in appellate attorney fees. Jason cross-appeals, arguing: Jessica's spousal support should be reduced because Jessica received $53,000 from his inheritance, and the alimony he was ordered to pay Jessica should have been deducted from his salary and considered as part of her income for the purpose of calculating child support. He asks us to award him $10,000 in appellate attorney fees.

## I. Background Facts and Proceedings.

Jessica and Jason were married in August 2003. Before the parties married, Jessica had finished her education and was licensed in cosmetology, and Jason had completed a Bachelor of Science degree in accounting. Jessica was working full-time as a cosmetologist and earning approximately $20,000 annually, while Jason worked full-time at John Deere.

The parties had their first child in 2004. Within a few months, they decided Jessica would leave her employment outside of the home to care for the child. Jessica and Jason had two more children, one in 2007 and one in 2009.

In the years before Jessica filed for dissolution, the family moved a number of times for Jason's career, both within the state of Iowa and outside of the country. Jessica remained the primary caregiver of the children, and she maintained both the inside and outside of the family home. Jason's job required

some travel, and he took business trips that lasted one week or longer several times a year. In 2012, Jason enrolled in a MBA program at the University of Chicago. During the twenty-month program, he went to Chicago every other weekend from Thursday through Saturday. Jason still worked full-time, so he completed schoolwork on nights after work or during the alternate weekend. John Deere paid for the schooling and all out-of-pocket expenses, and Jason earned the same salary that year as he did in other years.

Jessica filed the dissolution petition in August 2015, and the trial took place in July 2016, after almost thirteen years of marriage. Jason had recently made a lateral transfer at John Deere into a position that required less travel and had more flexible hours, thereby allowing him to spend more time with the children. Before trial, the parties agreed Jessica would have care of the children, but Jason would get six out of every fourteen nights with them. The parties share legal custody.

At trial, the parties presented evidence mostly in agreement regarding their assets and debts. The marital residence was appraised at a market value of $592,000, and the parties had approximately $197,500 in equity in the home. Since the parties separated, Jessica had purchased a new home valued at $300,000. She used $32,000 out of the parties' joint account as a down payment on the property and had made only a few payments on the mortgage since the purchase. Each party was awarded their home (and its debt), their vehicle, and some various small checking or savings accounts.

Jason asked the court to set aside as a nonmarital asset the $106,000 he inherited from his aunt; the money had been used as a down payment on the

marital home. The court declined to do so, stating it had "taken into consideration the amount of time that has transpired since the funds were comingled, as well as [Jessica's] considerable efforts in maintaining the marital asset that was acquired in part by use of the inherited funds." The court considered the values of the marital property, including the entire amount of equity in the marital home awarded to Jason and ordered Jason to make an equalization payment of $99,512.86 to Jessica within one year. Each party ultimately received one-half of the net assets of $322,963.18.

Additionally, Jason was ordered to divide his 401k in half (after subtracting his premarital contributions), with Jessica receiving approximately $295,500. She was also awarded a portion of Jason's pension, pursuant to the *Benson* formula.[1]

Although the parties agreed how much money each had earned the last several years, they disagreed over what the court should do with those sums. At the time of trial, Jason's base annual salary was $172,056. He received a bonus in December of each year based on the company's performance. In the three years leading up to the trial, the bonuses Jason received were very large, with his total compensation reaching $257,381 in 2013; $260,100 in 2014; and $267,968.00 in 2015. Jason testified it was possible there would be years he did not receive a bonus and future bonuses were likely to be much smaller because the three prior years had been the "golden years of agriculture." Jason asked the court to use his base salary to determine the amount of child support and

---

[1] *See In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996).

spousal support he owed and then to award Jessica a specific percentage of his bonus. Jessica asked the court to average the last few years of Jason's income—including both his bonus and his base salary—and use that number as the basis for the court's awards.

The parties also disagreed regarding how the court should consider Jessica's income. Jessica had performed some work outside of the home in the years leading up to the trial; she worked three hours a week as a spin instructor, became a Norwex consultant, and had a few clients whose hair she cut. Jessica earned $8819 in 2013; $5765 in 2014; and $3280 in 2015. She asked the court to use her actual income when determining the award of child support and spousal support, and Jason asked the court to impute a full-time, minimum wage income ($15,080) to Jessica when making the calculations.

The court used Jason's base salary and imputed an income of $15,080 to Jessica. After factoring Jason's cost of health insurance for the children and the 20% extraordinary visitation credit, the court ordered Jason to pay $1768.12 per month in child support while all three children remain at home.[2] Jason is also required to pay Jessica as additional child support 10% of the gross amount he receives for a bonus, within ten days after he receives it.[3]

Both parties agreed some spousal support for Jessica was warranted. Jessica asked the court to award her $6200 per month for eight years, while Jason maintained he should pay Jessica $1500 per month for a period of five

---

[2] The amount decreases to $1527.60 for two children and $1072.58 for one child.
[3] The percentage of his bonus Jason is required to pay in child support decreases to 8% for two children and 6% for one child.

years plus an additional 10% of the gross amount he receives as bonus. The court awarded Jessica sixty months of spousal support in the amount of $2000 each month and an additional 10% of the gross amount of Jason's bonuses in 2016–2020.

Jessica appeals, and Jason cross-appeals.

## II. Standard of Review.

We review de novo challenges to the economic provisions of a dissolution decree. *In re Marriage of Clinton*, 579 N.W.2d 835, 838 (Iowa Ct. App. 1998).

## III. Discussion.

### A. Inheritance.

Jason argues the district court improperly divided as marital property $106,000 he received as inheritance from his aunt. *See* Iowa Code § 598.21(5) ("The court shall divide all property, except inherited property or gifts received . . . by one party, equitably between the parties."). Because Jason's spousal-support claim rests on his argument about the inheritance, we consider it first.

Jason was ordered to make an equalization payment to Jessica in the amount of nearly $100,000. Jason claims this payment included $53,000 more than it should due to the district court's failure to set aside his inheritance as nonmarital.

Jason's uncontroverted evidence at trial established that his aunt had left $106,000 to him alone.[4] *See In re Marriage of Liebich*, 547 N.W.2d 844, 850 (Iowa Ct. App. 1996) ("In determining whether inherited property is divisible as

---

[4] Jason introduced into evidence the tax form from the estate listing him as the sole beneficiary of the monies.

marital property, the controlling factors are the intent of the donor and the circumstances surrounding the inheritance or gift."). But that does not end our inquiry. *See id.* ("[I]t is important to note inherited property may be divided as marital property where nondivision would be unjust.").

In considering whether the inheritance should be divided as marital property, we consider the following:

> (1) contributions of the parties toward the property, its care, preservation, or improvement; (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised; (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them; (4) any special needs of either party; (5) any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*Id.* In spite of her testimony that she "felt like [Jason's aunt] was a very close family member" to her, Jessica's other testimony belied this assertion. Jessica was unaware of the aunt's last name, her profession, or what type of cancer she ultimately died from. But both parties agreed Jessica was largely responsible for the care and preservation of the family home after it was purchased, and the appraisal noted the "above-average condition due to maintenance and age." The district court found this factor especially important, noting it as one of the main reasons it would be unjust not to divide the inheritance. Also, considering Jessica's history of lower earnings and the time it will take her to rebuild her clientele in order to reach her full earning capacity, we believe it is unfair to set aside the inheritance for Jason's enjoyment alone. *See id.* at 850–51 (affirming the district court's division of the husband's inheritance where it was "somewhat

unfair" to deny the wife any part of the assets because she "shared in the child rearing and domestic duties" and "her income-earning capacity would . . . be inhibited for a while").

Because it would be unjust to set aside Jason's inheritance, we affirm the district court's division of the inheritance as marital property.

**B. Spousal Support.**

Both parties appeal the district court's award of spousal support. Jessica does not ask for a specific change but asks that we increase the award to an amount we find "equitable and just."[5] Jason asks that we reduce the award of spousal support to $1500 per month for the same five-year period. He asks that we consider that "Jessica received a $53,000 windfall" when she was awarded half of his inheritance.

Alimony is not an absolute right, *see In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997), but here, both parties agree some award of support is appropriate. When determining the appropriateness of the alimony award, we must consider "(1) the earning capacity of each party, and (2) present standards of living and ability to pay balanced against relative needs of the other." *In re Marriage of O'Rourke*, 547 N.W.2d 864, 866 (Iowa Ct. App. 1996). "Alimony may be used to remedy inequities in a marriage and compensate a spouse who leaves the marriage at a financial disadvantage." *Id.*

---

[5] At oral argument, Jessica clarified that she was asking for the same amount she asked from the district court, $6200, but stated she was not contesting the five-year duration of the award.

"Types [of spousal support] are not mutually exclusive." *In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015). We note there are specific hallmarks regarding duration and purpose for each of the three types. *See, e.g.*, *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015) (noting an award of traditional support is generally of unlimited duration); *O'Rourke*, 547 N.W.2d at 866–67 (stating rehabilitative alimony allows a former spouse to become self-sufficient); *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989) (stating reimbursement alimony "is predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other"). But in determining the appropriate award, we focus our analysis on the factors set forth in Iowa Code section 598.21A (2015).[6] *See Witherly*, 867

---

[6] Iowa Code section 598.21A(1) provides:

1. Criteria for determining support. Upon every judgment of annulment, dissolution, or separate maintenance, the court may grant an order requiring support payments to either party for a limited or indefinite length of time after considering all of the following:

a. The length of the marriage.

b. The age and physical and emotional health of the parties.

c. The distribution of property made pursuant to section 598.21.

d. The educational level of each party at the time of marriage and at the time the action is commenced.

e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

g. The tax consequences to each party.

h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

i. The provisions of an antenuptial agreement.

N.W.2d at 559, 860 (stating "the moniker assigned to the spousal support award is a "red herring" and noting our supreme court "recently reiterated our obligation to follow [section 598.21A] in the absence of legislation adopting a different standard").

Jason and Jessica were married almost thirteen years. At the time of dissolution in 2016, Jessica was thirty-eight years old and Jason was forty; both testified they were in good health. At the time the parties married, Jason had a bachelor's degree and Jessica was a licensed cosmetologist. During the marriage, Jason obtained an MBA. Because Jason had to both travel and study for his MBA classes and he worked full-time while doing so, Jessica was often solely responsible for parenting during the twenty-month program. But the family incurred no monetary expense for Jason's degree because John Deere covered all of the costs. Additionally, Jason received his normal salary during the time period and remained the financial provider for the family.

At the time of dissolution, Jason earned a base annual salary of $172,056. He also received an annual bonus, which in recent years has been a large percent of his earnings. In 2015, the year before the dissolution trial, Jason earned total compensation of $267,968.00. In contrast, Jessica's highest year of earning was in 2003—the year the parties married—and she earned $20,000. In 2015, Jessica worked outside of the home limited hours, earning $3280. If we average Jessica's income from 2013–2015, her annual wage is $5987.33, or

---

j. Other factors the court may determine to be relevant in an individual case.

approximately $500 monthly. On her financial affidavit, Jessica listed her gross monthly income as $470.

Jessica initially claimed her monthly expenses were $5210 per month. After cross-examination, it became clear the $400 listed for "other expenses" was not for a designated, already-incurred expense. Thus, we consider her monthly expenses to be $4810. Once we consider the amount of child support the district court awarded Jessica—$1768 monthly—and Jessica's monthly salary at the time of trial—$470—Jessica's monthly expenses are exceeded by $2572.

We increase Jason's spousal-support obligation by $1000 per month, though we do not modify the duration of the award. Jessica's income at the time of the dissolution trial was a direct result of the parties' agreement she would focus her energy at home rather than the workforce, and she testified it will take at least one or two years for her to build up her clientele at the salon. We do not consider Jessica's receipt of $53,000 in inheritance money to be a windfall, as Jason claims, in light of her significant non-monetary contributions to the marriage.

We adjust the district court's award of spousal support; Jason is to pay Jessica $3000 per month for the same duration of five years. Jessica is still to receive 10% of Jason's gross bonus for the same duration; any arrearage in spousal support at the time Jason receives his bonus will also be paid from the bonus. The support shall terminate if Jessica dies or remarries prior to the sixty months expiring. The support will also terminate if Jason dies prior to the expiration of the sixty months.

**C. Child Support.**

Both parties appeal from the district court's child-support calculation. Jessica maintains we should include Jason's bonuses as part of his annual salary, rather than considering them separately. She also claims the court wrongly imputed income to her because it did not first find that she was "voluntarily unemployed or underemployed without just cause," as is required by Iowa Court Rule 9.11(4). In response, Jason asserts the amount of spousal support he pays Jessica should be deducted from his salary and considered as part of her income for the purpose of calculating child support.[7]

We start with Jason's claim first. Jason asked the district court to consider the alimony he pays Jessica as part of her income when calculating child support rather than part of his. The district court declined to do so. While our child

---

[7] Jason also makes a claim that Jessica's argument regarding the "interpretation of law" involving the child-support award is not preserved because she did not file an Iowa Rule of Civil Procedure 1.904(2) motion making the argument before the district court. In support of this claim, Jason cites an unpublished case from this court, *In re Marriage of Simon*, No. 14-0735, 2014 WL 7339335, at *1 (Iowa Ct. App. Dec. 24, 2014). In *Simon*, the divorcing parties entered into a stipulation involving all of the parties' real and farm equipment and provided for the husband to receive a large equalization payment. 2014 WL 7339335, at *1–2. After the stipulation was filed, the husband filed a notice revoking his signature and consent to the stipulation, and the parties then proceeded to trial. *Id.* at *2. At trial, the wife "presented appraisals for each farm, along with a proposed property distribution, listing the parties' assets with proposes valuations, as well as their liabilities." *Id.* In contrast, the husband did not provide an affidavit of financial status or any exhibits. *Id.* Although the husband testified the wife's values were low, he did not offer any evidence to support his opinion. *Id.* On appeal, the husband challenged the district court's calculation of the equalization payment, including challenging the valuations found by the district court. *Id.* at *5. Our court determined his claim was not preserved for review because he "did not present the issues he now raises on appeal concerning the district court's equalization-payment calculation at trial" and "[t]he mere mention of an alleged fact during testimony is not sufficient to preserve error on this issue." *Id.*

*Simon* is inapposite here; Jessica's claim is preserved for our review.

support guidelines do not require the district court to do so,[8] our case law allows it. *See, e.g.*, *In re Marriage of Lalone*, 469 N.W.2d 695, 697 (Iowa 1991) ("We agree with the district court that the present alimony has an effect on the income of both parties. Consideration of the amount of alimony paid under the present decree, while not provided by our guidelines as a deduction from income, may nevertheless be considered by the court in an attempt to 'do justice between the parties.'" (citation omitted)). In reviewing questions related to spousal support, we accord the trial court consideration latitude. *Gust*, 858 N.W.2d at 406. Although the district court has the discretion to subtract the current spousal support amount from income in child support calculations if failure to do so would result in substantial injustice to either party or the child, we do not find substantial injustice would occur in this case.

Next, we consider Jessica's claim that the district court's imputation of a minimum-wage income to her was improper. Iowa Court Rule 9.11(4) allows the trial court to impute income to a parent for the determination of child support "[i]f the court finds that a parent is voluntarily unemployed or underemployed without just cause." However, the court "shall not use earning capacity rather than actual earnings or otherwise impute income unless a written determination is made that, if actual earnings were used, substantial injustice would occur or adjustments

---

[8] We note that our supreme court recently completed "its quadrennial review of Iowa's Child Support Guidelines," with the resulting amendments taking effect January 1, 2018. *See* Iowa Sup. Ct., *In re Amendments to Iowa Court Rules Chapter 9—Child Support Guidelines* (July 20, 2017), http://www.iowacourts.gov/wfdata/frame10255-1235/File250.pdf. The amendment to rule 9.5(1)(a) provides, "Gross monthly income includes traditional or rehabilitative spousal support payments to be received by a party in the pending matter and prior obligation traditional or rehabilitative spousal support payments actually received by a party pursuant to court order." *Id.*

would be necessary to provide for the needs of the child(ren) or to do justice between the parties." Iowa Ct. R. 9.11(4). It is undisputed the district court did not make such a finding here, and we are unable to do so. Jessica's reduced income is a direct result of the parties' long-term agreement that she would focus her energies at home rather than in the workforce. Moreover, Jessica was the primary caregiver until after the parties separated and Jason made a lateral transfer at work, which gave him more flexibility in his work schedule and required less travel. At the time of the dissolution trial, Jessica was in the process of building clientele and returning more fully to the workforce; she testified it would likely take two years until her clientele was built back up. Furthermore, Jason testified he was supportive of Jessica's career, stating, "She is also a really, really good cosmetologist and hairdresser and I think she will be very successful at it." We are not concerned that using Jessica's actual salary, rather than an imputed salary, will prevent the children's needs from being met.

The court also should have used the average of Jason's total income—his base salary and his bonus—when determining his child-support obligation. *See In re Marriage of McCurnin*, 681 N.W.2d 322, 329–30 (Iowa 2004) ("All income that is not anomalous, uncertain, or speculative should be included for the purpose of determining a child support obligation. As to bonus income, the payor's income is evaluated to see if the amount paid was consistent from year to year." (emphasis added) (citation omitted)).

Because the district court improperly imputed income to Jessica when determining the child-support obligation and should have used the average of Jason's total income, we remand for recalculation of the award. On remand, the

district court should recalculate the obligation "based on the present financial circumstances of the parties and the child support guidelines." *In re Marriage of Hoffman*, 867 N.W.2d 26, 37 (Iowa 2015).

**D. Appellate Attorney Fees.**

Both parties ask us to award them appellate attorney fees. Jessica asks us to award her $6500 and Jason asks us to award him $10,000.

"Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "Factors to be considered in determining whether to award attorney fees include: 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (quoting *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005)).

While Jessica has been successful on appeal, we believe each party has the means to pay their own appellate attorney fees.

**IV. Conclusion.**

We affirm the trial court's division of Jason's inheritance. We adjust the award of spousal support to $3000 monthly for the same duration and leave Jessica's part of Jason's bonus intact. We remand the issue of child support to the district court to recalculate. We decline to award either party appellate attorney fees.

**AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED.**